Case 1:06-mc-00083-UNA    Document 1    Filed 04/26/2006    Page 1 of 1
APR-24-2006  12:26    US DISTRICT COURT EDPA                    P.01/07
Case 2:05-cv-02973-MMB    Document 210-1    Filed 03/31/2006    Page 1 of 7

*MMB*

*212*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMODITY FUTURES TRADING          :    CIVIL ACTION
COMMISSION,                         :
                                    :
            Plaintiff,              :
                                    :
     v.                             :    NO. 05-CV-2973 (MMB)
                                    :
PAUL M. EUSTACE, AND                :
PHILADELPHIA ALTERNATIVE ASSET :
MANAGEMENT COMPANY, LLC,            :
                                    :    **FILED**
                                    :
            Defendants.             :    APR 2 1 2006
                                         MICHAEL E. KUNZ, Clerk
                                         By_____ Dep. Clerk

## ORDER

AND NOW, this ___21___ day of ___April___, 2006, upon consideration of the

Motion of Receiver for and Order Re-Appointing Him as Receiver for Philadelphia Alternative

Asset Management Company, LLC, and its Partners, Affiliates, Subsidiaries and Related

Entities, it is hereby ORDERED that the Motion is GRANTED, and that the Consent Order of

September 21, 2005, is hereby REPUBLISHED in its entirety, effective as of the above date.

_____
Baylson, J.

*E-Mailed*
*Mailed*
*Faxed*
*4-24-06*
*See Attached*

# 462483 v 2

**JP**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

Case No. _0SCV2973_

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) **Complaint for Injunctive and Other** ) **Equitable Relief and for Civil Penalties** |
| PAUL M. EUSTACE, AND PHILADELPHIA ALTERNATIVE ASSET MANAGEMENT COMPANY, LLC | ) **Under the Commodity Exchange Act,** ) **as Amended, 7 U.S.C. §§ 1-25** ) ) ) |
| Defendants. | ) ) ) ) |

The U.S. Commodity Futures Trading Commission ("Commission"), by and through its

attorneys, hereby alleges as follows:

## I.

## SUMMARY

1.      Beginning in or about March 2003 and continuing through the present (the

"relevant period"), Paul M. Eustace ("Eustace") and Philadelphia Alternative Asset Management

Company, LLC ("PAAM") (collectively, "Defendants") have fraudulently solicited and accepted

at least $680,000 from at least one member of the general public to participate in a commodity

trading pool, Philadelphia Alternative Asset Fund, LP (the "LP Pool"). LP Pool claims to be a

hedge fund operated by PAAM and traded by Eustace, and was established to trade, among other

things, commodity futures and options contracts.

2.    The Defendants issued false statements to the LP Pool participant showing that as of January 31, 2005, the Pool was purportedly trading commodity futures and options and that his share of the LP Pool had increased in value to $1,118,973.

3.    The Defendants also attempted to solicit another prospective LP Pool participant by using a one-page chart purporting to show actual trading results from October 2002 through March 2004 reflecting a cumulative percentage return of 25.38%. In fact, Defendants had not achieved those results trading commodity futures and options for the LP Pool.

4.    At the time that these statements were issued, and as Eustace has admitted, the Defendants had not engaged in any commodity futures or options trading in the name of the LP Pool or the LP pool participant.

5.    Since approximately July 2004, the Defendants have operated two other commodity pools, the Philadelphia Alternative Asset Fund, Ltd., an off-shore pool ("Off-Shore Pool"), and the Philadelphia Alternative Asset Feeder Fund LLC. ("Feeder Fund"), which allows US customers to participate in the Off-Shore Pool. The Defendants have accepted over $230 million from pool participants. Those pools traded, among other things, commodity futures and options. According to the Defendants' website, the Off-Shore Pool traded on regulated futures markets.

6.    Beginning in February 2005 and continuing through May 2005, the Off-Shore Pool sustained severe trading losses exceeding $140 million. However, during those same months, the Defendants posted trading results on their website, www.paamcollc.com, reflecting that the Fund was trading profitably for those same months, and issued an account statement to at least one pool participant in the Feeder Fund showing that his account had increased in value in April 2005.

7.    The Defendants have engaged, are engaging, or are about to engage in acts and practices that violate the antifraud provisions of the Commodity Exchange Act, as amended ("Act"), 7 U.S.C. § 1 *et seq.*, and the Regulations of the Commodity Futures Trading Commission ("CFTC"), 17 C.F.R. § 1.1 *et seq.*, including Sections 4b(a)(2)(i) - (iii); 4c(b); and 4o(1)(A) and (B) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) - (iii); 6c(b); and 6o(1) (2002), and Sections 4.41(a) and 33.10 of the Commission's Regulations (the "Regulations"), 17 C.F.R. §§ 4.41(a) and 33.10. (2004).

8.    Eustace's actions and failures alleged in this Complaint were done within the scope of his employment with PAAM, and therefore PAAM is liable for his violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2002).

9.    In addition to his direct liability, Eustace directly or indirectly controls PAAM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting PAAM's violations alleged in this Complaint, and is therefore liable for PAAM's violations of the Act and Regulations pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2002).

10.    Accordingly, the Commission brings his action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2002), to enjoin the Defendants' unlawful acts and practices and to compel their compliance with the Act and CFTC Regulations. In addition, the Commission seeks disgorgement of the Defendants' ill-gotten gains, restitution to pool participants, civil monetary penalties, and such other relief as this Court may deem necessary or appropriate.

11.    Unless restrained and enjoined by this Court, the Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2002), which authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

13.    Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2002) in that the Defendants are found in, inhabit, or transact business in this District, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District.

## III.

## THE PARTIES

14.    Plaintiff Commission is an independent federal regulatory agency charged with the responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.* (2002), and the Regulations promulgated under it, 17 C.F.R. §§ 1 *et seq.* (2004).

15.    Defendant Eustace is an individual who resides in Ontario, Canada. Eustace is the President of PAAM. He has been registered with the CFTC as the sole Associated Person of PAAM since October 8, 2003, and is listed as its sole principal.

16.    Defendant PAAM is a Delaware Limited Liability Company with an office located in King of Prussia, PA. PAAM has been registered with the CFTC as a Commodity Pool Operator ("CPO") since October 8, 2003 and was a registered Commodity Trading Advisor ("CTA") from October 8, 2003 until January 13, 2005, when it withdrew its CTA registration.

## IV.

## <u>FACTS</u>

**A.    The Defendants Fraudulently Solicited at Least One LP Pool Participant and Issued False Statements to Him**

17.    Beginning in or about March 2003, Defendants solicited money from at least one known pool participant for participation in the LP Pool, which anticipated trading, among other things, commodity futures and options.

18.    In or about March 2003, the LP Pool participant invested $200,000 with the LP Pool, with the understanding that the LP Pool would be trading futures.  The LP Pool participant subsequently increased his investment to more than $680,000.

19.    After his initial investment, Eustace sent the LP Pool participant a fictitious monthly trading account statement purporting to show that the LP pool participant's investment had increased to $205,965 from trading commodity futures and options.

20.    This fictitious monthly account statement was issued on the LP Pool's letterhead and contains Eustace's name and title along the bottom.

21.    Throughout the relevant period, Eustace continued to send account statements to the LP Pool participant reflecting the profitable trading of commodity futures and options on behalf of the LP Pool and the LP Pool participant.  Those account statements were issued on LP Pool's letterhead and included a signature line for Eustace.  Most of the account statements were signed by Eustace.

22.    In or around January 2005, Eustace sent the LP pool participant a fictitious monthly trading account statement purporting to show that for the period ending January 31, 2005, the LP Pool participant's share of the pool had a then-current value of over $1.1 million from the LP Pool's trading of commodity  futures and options.

23.    This fictitious monthly account statement was issued on the LP Pool's letterhead and signed by Eustace.

24.    During the time that the LP pool participant was receiving these fictitious account statements, as Eustace has admitted, the Defendants never managed accounts that traded futures or options in the name of the LP Pool or the LP pool participant.

**B.    Defendants Presented Fictitious Trading Records To a Prospective Pool Participant**

25.    On or about March 8, 2004, Eustace sent promotional materials for the LP Pool to at least one prospective participant via e-mail, which included a PowerPoint presentation dated December 2003, describing the LP Pool; a private placement memorandum for the LP Pool dated December 2003; and a one-page document that purported to show actual trading results for the LP Pool for the period October 2002 through March 2004 (the "LP Pool trading chart").

26.    The PowerPoint presentation states that PAAM is the "General Manager" of the Pool, and that Eustace is the President of PAAM.

27.    The private placement memorandum refers to the LP Pool as "the Fund" and states that it is a "Delaware limited partnership organized for the purpose of achieving capital appreciation through investments in a wide range of capital market instruments," including commodity futures and options.

28.    The private placement memorandum also states that "The Fund and the General Partner are recently formed entities and have a limited past performance record."

29.    The trading chart states that "the Fund commenced trading under the direction of the Manager in October 2002. The Fund had no transaction history prior to this."

30.    The trading chart further states "Past performance may not be indicative of future performance."

31.     Each of these statements indicates that actual trading had taken place in the LP Pool by the date of the solicitation documents.  Nevertheless, at the time these statements were issued, by Eustace's admission, the Defendants had not actually conducted any trading for the LP Pool.

32.     On or about May 26, 2005, Eustace informed the National Futures Association ("NFA"), a self regulatory organization that oversees the commodity futures and options markets, that the trading chart "numbers were meant to demonstrate hypothetical performance of my trading strategies with a gradual escalation of assets" and provided purported back-up documentation reflecting futures trading results.  Eustace further explained that "[t]he entity referenced, Philadelphia Alternative Asset Fund, LP, in this document never had a trading account."  Philadelphia Alternative Asset Fund, LP is the LP Pool.

**C.     Defendant Eustace Did Not Disclose the Existence and Operation of the LP Pool to NFA**

33.     In or around September 20, 2004, NFA conducted an audit of PAAM.

34.     Eustace was the person at PAAM who responded to all of NFA's questions concerning PAAM.

35.     During the on-site audit of PAAM, NFA did not find any documents referring to the LP Pool, and Eustace did not disclose the existence of the LP Pool.

36.     As part of its audit, NFA conducted sworn testimony of Eustace and asked him to name all of the accounts over which he exercised any control during 2004.  Eustace identified four trading accounts that he managed in 2004.  Eustace did not identify or otherwise disclose that he managed the LP Pool.

37.     On or about May 20, 2005, NFA asked Eustace about the LP Pool and Eustace said it contained only personal money and might have been traded at F.C. Stone.  During the

relevant time period, FC Stone never maintained an account in the name of the LP Pool or Eustace.

38.    On or about May 24, 2005, Eustace changed his story and claimed that the LP Pool was never traded.

39.    On or about June 8, 2005, Eustace again revised his story, claiming that the LP Pool did not trade, and had never traded, futures or options, but instead had engaged in "swap transactions."

**D.    Defendants Issued False Statements to Participants and Posted False Trading Results On Its Website For An Off-Shore Commodity Pool**

40.    Beginning around July 2004 and continuing through the present, PAAM also operated the Off-Shore Pool which, according to PAAM, trades exclusively on regulated futures markets.  PAAM also operated the Feeder Fund, which allows US customers to participate in the Off-Shore Pool.  Defendants have solicited and accepted over $230 million from pool participants to trade in the Off-Shore Pool and Feeder Fund.

41.    During the relevant period, the Feeder Fund did not maintain any accounts in its own name.

42.    Those pools traded commodity futures and options on U.S. registered entities, or, in other words, on U.S. futures exchanges.

43.    Beginning in February 2005 and continuing through May 2005, the Off-Shore Pool sustained severe trading losses which totaled more than $140 million. By the end of May 2005, the accounts had lost $85 million, representing approximately 50 percent of the remaining value of the pool.

44.    In or about May 2005, the Defendants issued an account statement to one Feeder Fund pool participant showing that his monthly net return for April 2005 was 1.69%.

45.    In or about May 2005, the Defendants posted on their website, www.paamcollc.com, the following 2005 net returns for the Off-Shore Pool: 1.25% in February; 1.56% in March; 1.69% in April, with a year-to-date net return of 5.5%.

46.    In fact, the Off-Shore Pool's commodity futures and options trading resulted in the following losses during those months: February - $18 million (-10.36%); March - $7 million(-4.41%); April - $33 million (-17.94%); and May - $85 million (-50.16%).

47.    The April 2005 monthly account statement issued to the Feeder Fund pool participant was issued on Feeder Fund letterhead and signed by Paul Eustace.

## E.    Defendant Eustace Acted with Scienter and is the Controlling Person of PAAM

48.    In making the misrepresentations, omissions and false statements identified above, Eustace acted knowingly or with reckless disregard for the truth of those matters.

49.    Eustace is the President of PAAM and controls its overall day-to-day operations. Eustace is the only registered Associated Person and listed principal of PAAM, and the only person authorized to trade on behalf of PAAM until approximately March 2005.

50.    Eustace failed to act in good faith or knowingly induced, directly or indirectly, the violations alleged herein.

V.

## VIOLATIONS OF THE COMMODITY EXCHANGE ACT
## COUNT ONE

## VIOLATIONS OF SECTIONS 4b(a)(2)(i)-(iii) OF THE ACT : FRAUD IN THE SALE OF FUTURES CONTRACTS

51.    The allegations set forth in paragraphs 1 through 50 are realleged and incorporated herein by reference.

52.    Beginning in or about March 2003 and continuing through the present, the Defendants have: (1) cheated or defrauded or attempted to cheat or defraud other persons; (2) willfully made or caused to be made false reports or statements to other persons; and/or (3) willfully deceived or attempted to deceive other persons, in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of any other persons, where such contracts for future delivery were or could be used for the purposes set forth in Section 4b(a) of the Act, 7 U.S.C. § 6b(a), all in violation of Section 4b(a)(2)(i) - (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) - (iii) (2002).

53.    The Defendants, knowingly or with reckless disregard for the truth, violated Section 4b(a)(2)(i) - (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) - (iii) by, among other things (a) issuing false account statements to at least one LP pool participant showing fictitious futures trading; (b) omitting to inform at least one LP pool participant of the material information that defendants had not engaged in any futures trading in the name of the LP Pool or LP Pool participants; (c) providing false trading results to at least one prospective LP Pool participant showing profitable actual trading; (d) providing false account statements to at least one Feeder Fund pool participant; and (e) posting false trading results for the Off-Shore Pool on its website.

Complaint                                      10

54.    In addition to his direct liability, the actions and failures of Eustace as alleged herein were done within the scope of his employment with PAAM, and therefore PAAM is liable for his violations of Section 4b(a)(2)(i) - (iii) of the Act, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2002).

55.    Defendant Eustace, directly or indirectly, controlled PAAM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting PAAM's violations alleged in this count, and therefore Defendant Eustace is liable for PAAM's violations of Section 4b(a)(2)(i) - (iii) of the Act, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2002).

56.    Each act of issuing of false account statements; each failure to disclose material facts; each act of showing false trading results to prospective participants; and each posting of false trading results on the Defendants' website by the Defendants including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(i) - (iii) of the Act.

## COUNT TWO

### VIOLATIONS OF SECTION 4c(b) OF THE ACT
### AND REGULATION 33.10:
### OPTIONS FRAUD

57.    The allegations set forth in paragraphs 1 through 56 are realleged and incorporated herein by reference.

58.    Beginning in or about March 2003 and continuing through the present, the Defendants have: (1) cheated or defrauded or attempted to cheat or defraud other persons; (2) made or caused to be made to any other person any false report or statement thereof; and/or (3) deceived or attempted to deceive other persons, in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, commodity option

transactions, all in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 33.10(a) – (c), 17 C.F.R. § 33.10 (a) – (c).

59.    The Defendants, knowingly or with reckless disregard for the truth, violated Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 33.10(a) – (c), 17 C.F.R. § 33.10 (a) – (c) by, among other things: (a) issuing false account statements to at least one LP pool participant showing fictitious commodity options trading; (b) omitting to inform at least one LP pool participant that defendants had not engaged in any commodity options trading in the name of the LP Pool or LP Pool participants; (c) providing false trading results to at least one prospective LP pool participant; (d) providing false account statements to at least one Feeder Fund pool participant; and (e) posting false trading results for the Off-Shore Pool on its website.

60.    In addition to his direct liability, the actions and failures of Eustace as alleged herein were done within the scope of his employment with PAAM, and therefore PAAM is liable for his violation of Section 4c(b) of the Act and Regulation 33.10 (a) – (c), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2002).

61.    Defendant Eustace, directly or indirectly, controlled PAAM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations of PAAM alleged in this count, and thereby Eustace is liable for PAAM's violations of Section 4c(b) of the Act and Regulation 33.10 (a) – (c), pursuant to Section 13(b) of the Act.

62.    Each act of issuing of false account statements; each failure to disclose material facts; each act of showing false trading results to prospective participants; and each posting of false trading results on the Defendants' website by the Defendants including, but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4c(b) of the Act and Regulation 33.10 (a) – (c).

## COUNT THREE

## VIOLATIONS OF SECTION 4o(1) OF THE ACT AND REGULATION 4.41(a): FRAUD BY A COMMODITY POOL OPERATOR AND AN ASSOCIATED PERSON OF A COMMODITY POOL OPERATOR

63.    The allegations set forth in paragraphs 1 through 62 are realleged and incorporated herein by reference.

64.    Beginning in or about March 2003 and continuing through the present, Defendant PAAM was a registered CPO and acted as a CPO by soliciting, accepting or receiving funds from others and engaging in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of trading in commodities for future delivery or options on futures contracts on or subject to the rules of a contract market.  Defendant Eustace was a registered AP of a CPO, PAAM, and acted as an AP of a CPO by soliciting prospective pool participants.

65.    Beginning in or about March 2003 and continuing through the present, Defendant PAAM, while acting as a CPO, and Defendant Eustace, while acting as an AP of PAAM, knowingly or with reckless disregard for the truth, employed a device, scheme or artifice to defraud LP pool participants and prospective LP Pool, Off-Shore Pool and Feeder Fund pool participants, in violation of Section 4o(1)(A) of the Act, 7 U.S.C. § 6o(1)(A), and Commission Regulation 4.41(a)(1), 17 C.F.R. § 4.41(a)(1).

66.    Beginning in or about March 2003 and continuing through the present, Defendant PAAM, while acting as a CPO, and Defendant Eustace, while acting as an AP of PAAM, engaged in a transaction, practice or course of business which has operated as a fraud or deceit upon LP Pool, Off-Shore Pool and Feeder Fund pool participants and prospective LP Pool, Off-

Shore Pool and Feeder Fund pool participants, in violation of Section 4$o$(1)(B) of the Act, 7 U.S.C. § 6$o$(1)(B), and Commission Regulation 4.41(a)(2), 17 C.F.R. § 4.41(a)(2).

67.    The Defendants, knowingly or with reckless disregard for the truth, violated Sections 4$o$(1)(A) and (B) of the Act by, among other things: (a) issuing false account statements to at least one LP pool participant showing fictitious commodity futures and options trading; (b) omitting to inform at least one LP pool participant that the Defendants had not engaged in any commodity futures or options trading in the name of the pool or the pool participants; (c) providing false trading results to at least one prospective LP pool participant; (d) providing false account statements to at least one Feeder Fund pool participant; and (e) posting false trading results for the Off-Shore Pool on its website.

68.    The Defendants, knowingly or with reckless disregard for the truth, violated Commission Regulations 4.41(a)(1) and (2), 17 C.F.R. § 4.41(a)(1) and (2) by, among other things:  (a) posting false trading results for the Off-Shore Pool on its website, and (b) providing false trading results to at least one prospective LP pool participant.

69.    In addition to his direct liability, the actions and failures of Eustace as alleged herein were done within the scope of his employment with PAAM, and therefore PAAM is liable for his violations of Sections 4$o$(1)(A) and (B) of the Act, and Commission Regulation 4.41(a)(1) and (2) pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2002).

70.    Defendant Eustace, directly or indirectly, controlled PAAM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting PAAM's violations alleged in this count, and thereby Defendant Eustace is liable for PAAM's violations of Sections 4$o$(1)(A) and (B) of the Act, and Commission Regulation 4.41(a)(1) and (2), pursuant to Section 13(b) of the Act.

71.    Each act of issuing of false account statements; each failure to disclose material facts; each act of showing false trading results to prospective participants; and each posting of false trading results on the Defendants' website by the Defendants including, but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4o(1)(A) and (B) of the Act.

72.    Each act of showing false trading results to prospective participants; and each posting of false trading results on the Defendants' website by the Defendants including, but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4o(1)(A) and (B) of the Act. and Commission Regulation 4.41(a)(1) and (2).

## VI.

## RELIEF REQUESTED

WHEREFORE, the Commission, respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

a)    a permanent injunction prohibiting the Defendants and any other person or entity associated with them, including any successor thereof, from engaging in conduct violative of Sections 4b(a)(2)(i) - (iii), 4c(b), and 4o(1) (A) and (B) of the Act and Sections 4.41 and 33.10 of the Commission's Regulations, and from engaging in any commodity-related activity, including soliciting new pool participants or pool funds;

b)    an order directing the Defendants to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constitute violations of the Act or Regulations, as described herein, and interest thereon from the date of such violations;

c)    an order directing the Defendants to make full restitution to every pool participant whose funds were received by him as a result of acts and practices which constituted violations of the Act and Regulations, as described herein, and interest thereon from the date of such violations;

d)      an order requiring Defendants to pay civil monetary penalties
under the Act, to be assessed by the Court, in amounts of not more
than the higher of $120,000 for each violation before October 24,
2004 and $130,000 for violations on or after October 24, 2004, or
triple the monetary gain to Defendants for each violation of the Act
and Regulations described herein; and

e)      such other and further remedial ancillary relief as the Court may
deem appropriate.

Date:   __6/22__, 2005

Respectfully submitted by,

**ATTORNEYS FOR PLAINTIFF**

__/s/__

William Longwitz, Esq., MS Bar No. 101047
Karen Kenmotsu, Esq., NJ Bar No. 05713-1993
Gretchen L. Lowe, Esq., DC Bar No. 421995
Division of Enforcement
Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581
Phone – (202) 418-5642
Facsimile – (202) 418-5523

Complaint                                         16

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, ) | |
| ) | Case No. 05-CV-2973 (MMB) |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| PAUL M. EUSTACE, AND ) | |
| PHILADELPHIA ALTERNATIVE ASSET ) | |
| MANAGEMENT COMPANY, LLC ) | |
| ) | |
| Defendants. ) | |
| ) | |

**First Amended Complaint for Injunctive and Other Equitable Relief and for Civil Penalties Under the Commodity Exchange Act, as Amended, 7 U.S.C. §§ 1-25**

The U.S. Commodity Futures Trading Commission ("Commission"), by and through its attorneys, hereby alleges as follows:

## I.

## SUMMARY

1.      Commencing in at least the spring of 2001, Defendant Paul M. Eustace ("Eustace") solicited individuals to invest in a commodity pool known as the Option Capital Fund LP ("Option Capital Fund"), which he operated. The purpose of the Option Capital Fund was to trade commodity futures and options.

2.      Eustace solicited at least $4 million from at least 12 investors to participate directly in the Option Capital Fund. As detailed below, the Option Capital Fund later may have received over $28 million in funds from another commodity pool operated by Eustace and defendant Philadelphia Alternative Asset Management Co., LLC ("PAAM") (collectively, "Defendants").

First Amended Complaint

3.      Beginning in at least July 2001 and continuing through May 2005, Eustace issued false account statements to the Option Capital Fund participants reflecting an overall profitable trading of commodity futures and options and showing that Option Capital Fund participants' shares in the Fund were increasing in value.

4.      The only known commodity futures and options trading accounts held in the name of the Option Capital Fund were opened and maintained by Eustace only from approximately late October 2000 through late March 2003. Those trading accounts overall lost over $1 million trading commodity futures and options.

5.      At the time these trading accounts were opened, the Option Capital Fund participants received account statements from Eustace showing overall profitable trading.

6.      Upon information and belief, in at least May 2005, if not throughout the life of the Option Capital Fund, Eustace commingled Option Capital Fund participants' funds with his personal funds and traded those funds in his personal futures and options trading accounts.

7.      Since March 2000, Eustace's trading in his personal futures and options accounts overall has lost money. For example, from January 2005 through May 2005, Eustace sustained over $22 million in trading losses, and in April and May 2005 alone, sustained over $8.5 million in losses in his personal trading accounts. After March 2003, there were no known commodity trading accounts in the name of the Option Capital Fund.

8.      Nevertheless, Eustace continued to issue account statements to the Option Capital Fund participants for January 2005 through May 2005 showing overall profitable trading of commodity futures and options and a net positive return of 6.45 % year to date as of May 31, 2005.

First Amended Complaint          2

9.     Commencing in at least October 2002 and continuing through the present (the "relevant period"), Defendants fraudulently solicited and accepted at least $28 million from at least ten members of the general public to participate in a commodity pool, Philadelphia Alternative Asset Fund, LP (the "LP Pool"). The LP Pool claims to be a hedge fund operated by PAAM and traded by Eustace, and was established to trade, among other things, commodity futures and options.

10.     Commencing in at least October 2002 and continuing through May 2005, the Defendants issued false statements to the LP Pool participants, showing that the Pool was profitably trading commodity futures and options, when in fact, Defendant Eustace has represented that he never traded commodity futures and options on behalf of the LP Pool.

11.     For example, in October 2002, the Defendants issued an account statement to one LP Pool participant showing that the LP Pool had profitably traded commodity futures and options and that his original investment of $250,000 had a monthly return of 1.25%. In May 2005, the Defendants issued an account statement to this same LP Pool participant showing a net return in percent from inception of the account of 53.10% and a monthly net asset value of $382,744.66 for his interest in the LP Pool.

12.     The Defendants also solicited prospective LP Pool participants with false trading performance results.

13.     In the summer of 2002, the Defendants successfully solicited an LP Pool participant by providing the participant with the purported trading record of the Option Capital Fund. That record purported to show actual profitable futures and options trading results for the Option Capital Fund for the period of June 2001 through July 2002 when in fact neither the

known commodity futures and options accounts in the name of the Option Capital Fund nor any personal accounts traded by Eustace had achieved those overall results.

14.    Around March 2004, the Defendants attempted to solicit one prospective LP Pool participant by using a one-page chart purporting to show actual trading results from October 2002 through March 2004 reflecting a cumulative percentage return of 25.38%. In fact, Defendants had not achieved those results trading commodity futures and options for the LP Pool.

15.    In fact, the Defendants had not directly engaged in any commodity futures or options trading in the name of the LP Pool or the LP Pool participants during the life of the LP Pool. In May 2005, Eustace represented to the National Futures Association ("NFA"), a self regulatory organization to which the Commission has delegated certain oversight responsibilities, that the LP Pool had never traded commodity futures and options. In July 2005, Eustace represented in a bankruptcy filing that the LP Pool had invested over $28 million in the Option Capital Fund.

16.    To the extent that Defendants traded LP Pool funds in other accounts trading futures and options, including either the Option Capital Fund, his personal trading accounts or any other trading accounts under Eustace's control, those accounts overall were losing money throughout the life of the LP Pool.

17.    Since approximately July 2004, the Defendants have operated two other commodity pools, the Philadelphia Alternative Asset Fund, Ltd., an off-shore pool ("Off-Shore Pool"), and the Philadelphia Alternative Asset Feeder Fund LLC. ("Feeder Fund"), which allows US customers to participate in the Off-Shore Pool. The Defendants have accepted over $230 million from pool participants for those pools.

18.    Those pools traded, among other things, commodity futures and options in several accounts opened and maintained in the name of the Off-Shore Pool at two futures commission merchants ("FCMs"). According to the Defendants' website, the Off-Shore Pool traded on "regulated" futures markets.

19.    Beginning in February 2005 and continuing through May 2005, the Off-Shore Pool sustained severe trading losses exceeding $140 million. However, during those same months, the Defendants posted trading results on their website, www.paamcollc.com, reflecting that the Fund was trading profitably for those same months. Defendants also issued or caused to be issued account statements to the Off-Shore Pool and Feeder Fund participants reflecting that the Off-Shore Pool was profitably trading commodity futures and options. The Off-Shore Pool and Feeder Fund participants believed that the net asset value of the Off-Shore Pool was over $230 million at the end of May 2005.

20.    Defendants hid the massive trading losses from the Off-Shore Pool participants by ensuring that the administrators for the Off-Shore Pool who had the responsibility to issue and did issue account statements to the Pool participants did not have access to account information for at least one of the trading accounts opened and traded in the name of the Off-Shore Pool by Eustace. Defendants also hid the trading losses from the Feeder Fund participants by creating and issuing false account statements directly to the Feeder Fund participants.

21.    At the same time, Eustace was issuing or causing to be issued false account statements showing profitable trading for all the commodity pools he managed, the Option Capital Fund, the LP Pool, the Feeder Fund and the Off-Shore Pool, Defendants were earning incentive fees based on the purported profits as well as management fees based on the purported lawful operation of the pools. Eustace also moved pool participant funds into his personal

First Amended Complaint                 5

trading accounts or banking accounts. As a result, Defendants misappropriated pool participant funds.

22. The Defendants have engaged, are engaging, or are about to engage in acts and practices that violate the antifraud provisions of the Commodity Exchange Act, as amended ("Act"), 7 U.S.C. § 1 *et seq.*, and the Regulations of the Commodity Futures Trading Commission ("Commission"), 17 C.F.R. § 1.1 *et seq.*, including Sections 4b(a)(2)(i) - (iii); 4c(b); and 4o(1)(A) and (B) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) - (iii); 6c(b); and 6o(1) (2002), and Sections 4.41(a) and 33.10 of the Commission's Regulations (the "Regulations"), 17 C.F.R. §§ 4.41(a) and 33.10. (2004).

23. Eustace's actions and failures with respect to the LP Pool, Off-Shore Pool and the Feeder Fund alleged in this Complaint were done within the scope of his employment with PAAM, and therefore PAAM is liable for his violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2002).

24. In addition to his direct liability, Eustace directly or indirectly controls PAAM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting PAAM's violations alleged in this Complaint, and is therefore liable for PAAM's violations of the Act and Regulations pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2002).

25. With respect to the Option Capital Fund, Defendant Eustace operated as a commodity pool operator ("CPO") without being registered as such, in violation of Section 4m(1) of the Act, 7 U.S.C. §6m(1) (2002) and commingled investor funds with his personal accounts in violation of Commission Regulation 4.20, 17 C.F.R. § 4.20.

26. Accordingly, the Commission brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2002), to enjoin the Defendants' unlawful acts and practices and to compel

their compliance with the Act and Commission Regulations. In addition, the Commission seeks disgorgement of the Defendants' ill-gotten gains, restitution to pool participants, civil monetary penalties, and such other relief as this Court may deem necessary or appropriate.

27.    Unless restrained and enjoined by this Court, the Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.

## JURISDICTION AND VENUE

28.    This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2002), which authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

29.    Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2002) in that the Defendants are found in, inhabit, or transact business in this District, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District.

## III.

## THE PARTIES

30.    Plaintiff Commission is an independent federal regulatory agency charged with the responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.* (2002), and the Regulations promulgated under it, 17 C.F.R. §§ 1 *et seq.* (2004).

31.    Defendant Eustace is an individual who resides in Ontario, Canada. Eustace is the President of PAAM. He has been registered with the CFTC as the sole associated person ("AP") of PAAM since October 8, 2003, and is listed as its sole principal.

32.    Defendant PAAM is a Delaware Limited Liability Company with an office located in King of Prussia, Pennsylvania. PAAM has been registered with the Commission as a commodity pool operator ("CPO") since October 8, 2003 and was a registered commodity trading advisor ("CTA") from October 8, 2003 until January 13, 2005, when it withdrew its CTA registration.

IV.

FACTS

**A.    Defendant Eustace Fraudulently Operated the Option Capital Fund**

33.    Commencing in at least the spring of 2001, Eustace solicited individuals to invest in the Option Capital Fund, which was a commodity pool that was to trade commodity futures and options.

34.    Eustace was the General Partner and operator of the Option Capital Fund.

35.    Eustace solicited over at least $4 million from at least 12 individuals to participate directly in the Option Capital Fund.

36.    The Option Capital Fund later may have received over $28 million in funds of the LP Pool.

37.    Commencing in at least July 2001 and continuing through May 2005, Eustace issued false account statements to the Option Capital Fund participants which reflected overall profitable trading of commodity futures and options.

First Amended Complaint                    8

38.    The fictitious monthly account statements were issued on Option Capital Fund letterhead and identified Eustace as the commodity pool operator.

39.    The only known commodity futures and options accounts held in the name of Option Capital Fund were opened by Eustace, and Eustace had the sole trading authority over the accounts.

40.    Eustace maintained those Option Capital Fund accounts from approximately October 2000 through March 2003 and sustained overall trading losses of over $1 million.

41.    During the time these Option Capital Fund accounts were opened, Option Capital Fund participants were receiving account statements prepared and issued by Eustace reflecting overall profitable trading.

42.    One Option Capital Fund participant received an account statement in April 2003 reflecting a monthly percent return of 1.73% even though the Option Capital Fund trading accounts were closed by April 2003.

43.    Upon information and belief, in at least May 2005, if not throughout the life of the Option Capital Fund, Eustace moved Option Capital Fund money into his personal trading accounts, which overall lost money trading.

44.    For instance, from January 2005 through May 2005, Eustace sustained over $22 million in trading losses in his personal trading accounts. In January 2005, he sustained over $15 million in trading losses and in April and May, collectively, sustained over $8 million in losses in his personal trading accounts. Since March 30, 2000, Eustace has sustained in his known personal trading accounts over $19 million in trading losses.

45.    After March 2003, there were no known commodity trading accounts in the name of the Option Capital Fund.

First Amended Complaint                    9

46.     Eustace issued account statements to Option Capital Fund participants for January 2005 through May 2005 showing overall profitable trading and showing that the Option Capital Fund pool had a net positive return of 6.45 % year to date as of May 2005.

47.     One Option Capital Fund participant received an account statement from Eustace showing that as of May 31, 2005, his net return since inception of account was over $258,000 or 70.27% and that he had a net asset value of over $1.1 million.

48.     In July 2005, Eustace filed for personal bankruptcy in Ontario, Canada. As part of his filing, Eustace represented under oath that the Option Capital Fund was owed over $28 million.

## B.     The Defendants Fraudulently Operated the LP Pool and Issued False Statements to Participants

49.     Beginning in at least the fall of 2002, Defendants fraudulently solicited and accepted at least $28 million from at least ten investors for participation in the LP Pool, which anticipated trading, among other things, commodity futures and options.

50.     From at least October 2002 through May 2005, Eustace sent LP Pool participants fictitious monthly trading account statements purporting to show that the LP Pool participants' investments were overall increasing in value from the trading of commodity futures and options.

51.     The fictitious monthly account statements were issued on the LP Pool's letterhead and contained Eustace's name and title along the bottom. The account statements were often signed by Eustace.

52.     During the time that the LP pool participants were receiving these fictitious account statements, the Defendants never managed accounts that directly traded commodity futures or options in the name of the LP Pool or the LP pool participants. In May 2005, Eustace represented to the NFA that the LP Pool had never traded futures and options.

53.     However, in a July 2005 bankruptcy filing, Eustace represented under oath that the LP Pool was an investor in the Option Capital Fund and that the LP Pool's reported balance was approximately $29,000,000.

54.     Eustace had represented to certain LP Pool participants and others that the LP Pool was closing in late 2004 and that the LP Pool funds would be invested in the Off-Shore Pool via the Feeder Fund, which is another commodity pool operated by PAAM. As alleged below, that Fund sustained massive losses.

55.     Defendants deposited LP Pool funds into an Option Capital Fund bank or trading accounts or other bank or trading accounts under the management or control of Eustace.

56.     As alleged above, any trading done in the name of or for the benefit of Option Capital Fund, either directly in trading accounts in the name of Option Capital Fund, in Eustace's personal trading accounts or any trading accounts Eustace managed or controlled, overall sustained losses from the trading of commodity futures and options.

**C.      Defendants Presented Fictitious Trading Records to Prospective LP Pool Participants**

57.     In October 2002, Eustace successfully solicited at least one investor to participate in the LP Pool by providing, among other information, a purported trading record of the Option Capital Fund.

58.     That record purported to show profitable futures and options trading results for the Option Capital Fund for the period of June 2001 through July 2002, when in fact the known commodity futures and options accounts in the name of the Option Capital Fund had not achieved those same overall results and to the extent that Eustace traded Option Capital Pool funds in his personal trading accounts, his personal accounts had not achieved the same overall results.

First Amended Complaint                    11

59.    This LP Pool participant relied in part on those past trading results in making the decision to invest and invested approximately $250,000 in the LP Pool.

60.    On or about March 8, 2004, Eustace sent promotional materials for the LP Pool to at least one prospective participant via e-mail, which included a PowerPoint presentation dated December 2003, describing the LP Pool; a private placement memorandum for the LP Pool dated December 2003; and a one-page document that purported to show actual trading results for the LP Pool for the period October 2002 through March 2004 (the "LP Pool trading chart").

61.    The PowerPoint presentation states that PAAM is the "General Manager" of the Pool, and that Eustace is the President of PAAM.

62.    The private placement memorandum refers to the LP Pool as "the Fund" and states that it is a "Delaware limited partnership organized for the purpose of achieving capital appreciation through investments in a wide range of capital market instruments," including commodity futures and options.

63.    The private placement memorandum also states that "The Fund and the General Partner are recently formed entities and have a limited past performance record."

64.    The trading chart states that "the Fund commenced trading under the direction of the Manager in October 2002. The Fund had no transaction history prior to this."

65.    The trading chart further states "Past performance may not be indicative of future performance."

66.    Each of these statements indicates that actual trading had taken place in the LP Pool by the date of the solicitation documents. Nevertheless, at the time these statements were issued, by Eustace's representation, the Defendants had not actually conducted any trading in the

name of the LP Pool. To the extent that the purported trading record reflected trading on behalf of Option Capital Fund, Eustace had not achieved the same overall results for that Fund.

67.    On or about May 26, 2005, Eustace informed NFA that the trading chart "numbers were meant to demonstrate hypothetical performance of my trading strategies with a gradual escalation of assets" and provided purported back-up documentation reflecting futures trading results. Eustace further explained that "[t]he entity referenced, Philadelphia Alternative Asset Fund, LP, in this document never had a trading account." Philadelphia Alternative Asset Fund, LP is the LP Pool.

**D.    Defendant Eustace Did Not Disclose the Existence and Operation of the LP Pool to NFA**

68.    In or around September 20, 2004, NFA conducted an audit of PAAM.

69.    Eustace was the person at PAAM who responded to all of NFA's questions concerning PAAM.

70.    During the on-site audit of PAAM, NFA did not find any documents referring to the LP Pool, and Eustace did not disclose the existence of the LP Pool.

71.    As part of its audit, NFA conducted sworn testimony of Eustace and asked him to name all of the accounts over which he exercised any control during 2004. Eustace identified four trading accounts that he managed in 2004. Eustace did not identify or otherwise disclose that he managed the LP Pool.

72.    On or about May 20, 2005, NFA asked Eustace about the LP Pool and Eustace said it contained only personal money and might have been traded at FC Stone. During the relevant time period, FC Stone never maintained an account in the name of the LP Pool or Eustace.

73.     On or about May 24, 2005, Eustace changed his story and claimed that the LP Pool was never traded.

74.     On or about June 8, 2005, Eustace again revised his story, claiming that the LP Pool did not trade, and had never traded, futures or options, but instead had engaged in "swap transactions."

75.     In his July 2005 bankruptcy filing, Eustace represented that the LP Pool was invested in the Option Capital Fund.

### E.     Defendants Issued False Statements to Participants and Posted False Trading Results on Its Website for an Off-Shore Commodity Pool

76.     Beginning around July 2004 and continuing through the present, PAAM also operated the Off-Shore Pool which, according to PAAM, trades exclusively on regulated futures markets. PAAM also operated the Feeder Fund, which allows U.S. customers to participate in the Off-Shore Pool.

77.     Defendants have solicited and accepted over $230 million from pool participants to trade in the Off-Shore Pool and Feeder Fund.

78.     During the relevant period, the Feeder Fund did not maintain any trading accounts in its own name.

79.     Those pools traded commodity futures and options on U.S. registered entities, or, in other words, on U.S. futures exchanges.

80.     Eustace opened one trading account at one FCM and several trading accounts at another FCM, only two of which appear to have been actively traded, in the name of the Off-Shore Pool. Eustace had sole trading authority over those Off-Shore Pool accounts.

81.     The Off-Shore Pool had an administrator for the Pool which prepared and issued account statements to the Off-Shore Pool investors. The administrator prepared the account

First Amended Complaint                    14

statements based on Off-Shore Pool account information they accessed through websites maintained at the two FCMs.

82.     Defendants prepared and issued account statements directly to the Feeder Fund participants on Feeder Fund letterhead and with Eustace's name and title, as President.

83.     Beginning in February 2005 and continuing through May 2005, the Off-Shore Pool sustained severe trading losses in at least one Off-Shore Pool trading account which totaled more than $140 million. By the end of May 2005, the accounts had lost $85 million, representing approximately fifty percent of the remaining value of the pool.

84.     During this time, the Defendants issued account statements to Feeder Fund participants showing overall profitable trading of futures and options. For example, in or about May 2005, the Defendants directly issued account statements to at least one Feeder Fund pool participant showing a monthly net return for April 2005 of 1.69%.

85.     In or about May 2005, the Defendants posted on their website, www.paamcollc.com, the following 2005 net returns for the Off-Shore Pool: 1.25% in February; 1.56% in March; 1.69% in April, with a year-to-date net return of 5.5%.

86.     For these same months, Defendants caused account statements to be issued to the Off-Shore Pool participants that reflected the overall profitable trading of futures and options, with the account statements for May 2005 reflecting a cumulative net asset value of over $230 million at the end of May.

87.     In fact, the Off-Shore Pool's commodity futures and options trading accounts had sustained the following losses during those months: February - $18 million (-10.36%); March - $7 million (-4.41%); April - $33 million (-17.94%); and May - $85 million (-50.16%).

First Amended Complaint                15

88.     Defendants masked the massive trading losses from the Off-Shore investors by ensuring that the administrators of the Off-Shore Pool did not have access to account information for at least one trading account opened in the name of the Off-Shore Pool and traded by Eustace and from the Feeder Fund participants by issuing false accounts statements prepared by PAAM.

**F.     Defendants Misappropriated Pool Participants' Funds**

89.     At the same time, Eustace was issuing or causing to be issued false account statements showing profitable trading for the Option Capital Fund, Eustace was earning incentive fees based on the purported profits as well as management fees based on the purported lawful operation of the Option Capital Fund.

90.     Eustace also moved at least Option Capital Fund participants' funds into his personal trading or banking accounts.

91.     As a result, Eustace misappropriated funds belonging to at least the Option Capital Fund participants.

92.     At the same time, Defendants were issuing or causing to be issued false account statements showing profitable trading for the LP Pool, Feeder Fund and Off-Shore Pool, Defendants were earning incentive fees based on the purported profits as well as management fees based on the purported lawful operation of the pools.

93.     Eustace also moved LP Pool funds, through the Option Capital Fund, into his personal trading or banking accounts.

94.     As a result, Defendants misappropriated funds belonging to the LP Pool, Feeder Fund and Off-Shore Pool participants.

First Amended Complaint                    16

**G.    Defendant Eustace Acted with Scienter and is the Controlling Person of PAAM**

95.    In making the misrepresentations, omissions and false statements identified

above, Eustace acted knowingly or with reckless disregard for the truth of those matters.

96.    Eustace is the President of PAAM and controls its overall day-to-day operations.

Eustace is the only registered associated person and listed principal of PAAM, and the only

person authorized to trade on behalf of PAAM until approximately March 2005.

97.    Eustace failed to act in good faith or knowingly induced, directly or indirectly, the

violations alleged herein.

**V.**

**VIOLATIONS OF THE COMMODITY EXCHANGE ACT**
**COUNT ONE**

**VIOLATIONS OF SECTIONS 4b(a)(2)(i)-(iii) OF THE ACT:**
**FRAUD IN THE SALE OF FUTURES CONTRACTS**

98.    The allegations set forth in paragraphs 1 through 97 are realleged and

incorporated herein by reference.

99.    Beginning in or about Spring 2001 and continuing through the present, with

respect to the Option Capital Fund, Defendant Eustace, has: (1) cheated or defrauded or

attempted to cheat or defraud other persons; (2) willfully made or caused to be made false reports

or statements to other persons; and/or (3) willfully deceived or attempted to deceive other

persons, in or in connection with orders to make, or the making of, contracts of sale of

commodities for future delivery, made, or to be made, for or on behalf of any other persons,

where such contracts for future delivery were or might be used for the purposes set forth in

Section 4b(a) of the Act, 7 U.S.C. § 6b(a), all in violation of Section 4b(a)(2)(i) - (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) - (iii) (2002).

100.    Beginning in or about March 2003 and continuing through the present, with respect to the LP Pool, Feeder Fund, and Off-Shore Pool, the Defendants have: (1) cheated or defrauded or attempted to cheat or defraud other persons; (2) willfully made or caused to be made false reports or statements to other persons; and/or (3) willfully deceived or attempted to deceive other persons, in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of any other persons, where such contracts for future delivery were or might be used for the purposes set forth in Section 4b(a) of the Act, 7 U.S.C. § 6b(a), all in violation of Section 4b(a)(2)(i) - (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) - (iii) (2002).

101.    Defendant Eustace knowingly or with reckless disregard for the truth, violated Section 4b(a)(2)(i) - (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) - (iii) by, among other things (a) issuing false account statements to Option Capital Fund participants showing false trading results; (b) omitting to inform Option Capital Fund participants of the material information that defendants had not engaged in any futures trading in the name of the Option Capital Fund after March 2003; and (c) misappropriating Option Capital Fund and LP Pool funds by transferring Option Capital Fund and LP Pool funds into Eustace's personal trading or banking accounts; and by collecting incentive and management fees that he had not earned and was therefore not entitled to collect.

102.    The Defendants, with respect to the LP Pool, Feeder Fund, and Off-Shore Pool, knowingly or with reckless disregard for the truth, violated Section 4b(a)(2)(i) - (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) - (iii) by, among other things (a) issuing false account statements to LP Pool

participants showing fictitious futures trading; (b) omitting to inform LP pool participants of the material information that defendants had not engaged in any futures trading in the name of the LP Pool or LP Pool participants; (c) providing false trading results to solicit LP Pool participants showing profitable actual trading; (d) providing false account statements to Feeder Fund pool participants showing profitable actual trading ; (e) causing false statements to be issued to Off-Shore Pool investors; (f) posting false trading results for the Off-Shore Pool on their website; and (g) misappropriating LP Pool, Feeder Fund and Off-Shore Pool funds by collecting incentive and management fees they had not earned and were therefore not entitled to collect.

103.    In addition to his direct liability, the actions and failures of Eustace as alleged herein with respect to the LP Pool, Feeder Fund and Off-Shore Pool were done within the scope of his employment with PAAM, and therefore PAAM is liable for his violations of Section 4b(a)(2)(i) - (iii) of the Act, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2002).

104.    Defendant Eustace, directly or indirectly, controlled PAAM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting PAAM's violations alleged in this count, and therefore Defendant Eustace is liable for PAAM's violations of Section 4b(a)(2)(i) - (iii) of the Act, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2002).

105.    Each act of issuing of false account statements; each failure to disclose material facts; each act of showing false trading results to prospective participants; each act of misappropriation; and each posting of false trading results on the Defendants' website by the Defendants including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(i) - (iii) of the Act.

First Amended Complaint                    19

## COUNT TWO

## VIOLATIONS OF SECTION 4c(b) OF THE ACT
## AND REGULATION 33.10:
## OPTIONS FRAUD

106.    The allegations set forth in paragraphs 1 through 105 are realleged and incorporated herein by reference.

107.    Beginning in or about Spring 2001 and continuing through the present, with respect to the Option Capital Fund, Defendant Eustace has: (1) cheated or defrauded or attempted to cheat or defraud other persons; (2) made or caused to be made to any other person any false report or statement thereof; and/or (3) deceived or attempted to deceive other persons, in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, commodity option transactions, all in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 33.10(a) – (c), 17 C.F.R. § 33.10 (a) – (c).

108.    Beginning in or about March 2003 and continuing through the present, with respect to the LP Pool, Feeder Fund and Off-Shore Pool, the Defendants have: (1) cheated or defrauded or attempted to cheat or defraud other persons; (2) made or caused to be made to any other person any false report or statement thereof; and/or (3) deceived or attempted to deceive other persons, in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, commodity option transactions, all in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 33.10(a) – (c), 17 C.F.R. § 33.10 (a) – (c).

109.    Defendant Eustace, with respect to the Option Capital Fund, knowingly or with reckless disregard for the truth, violated Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 33.10(a) – (c), 17 C.F.R. § 33.10 (a) – (c) by, among other things: (a) issuing false

First Amended Complaint                    20

account statements to Option Capital Fund participants showing false trading results; (b)

omitting to inform Option Capital Fund participants of the material information that defendants

had not engaged in any futures trading in the name of the Option Capital Fund after March 2003;

and (c) misappropriating Option Capital Fund and LP Pool funds by transferring Option Capital

Fund and LP Pool funds into Eustace's personal trading or banking accounts; and by collecting

incentive and management fees that he had not earned and was therefore not entitled to collect.

110.    The Defendants, with respect to the LP Pool, Feeder Fund, and Off-Shore Pool,

knowingly or with reckless disregard for the truth, violated Section 4c(b) of the Act, 7 U.S.C. §

6c(b), and Regulation 33.10(a) – (c), 17 C.F.R. § 33.10 (a) – (c) by, among other things: (a)

issuing false account statements to LP Pool participants showing fictitious commodity options

trading; (b) omitting to inform LP Pool participants that defendants had not engaged in any

commodity options trading in the name of the LP Pool or LP Pool participants; (c) providing

false trading results to solicit LP pool participants showing profitable trading; (d) causing false

statements to be issued to Off-Shore pool participants; (e) providing false account statements to

Feeder Fund pool participants; (f) posting false trading results for the Off-Shore Pool on their

website; and (g) misappropriating LP Pool, Feeder Fund and Off-Shore Pool funds by collecting

incentive and management fees they had not earned and were therefore not entitled to collect.

111.    In addition to his direct liability, the actions and failures of Eustace as alleged

herein with respect to his activities with the LP Pool, Feeder Fund and Off-Shore Pool were done

within the scope of his employment with PAAM, and therefore PAAM is liable for his violation

of Section 4c(b) of the Act and Regulation 33.10 (a) – (c), pursuant to Section 2(a)(1)(B) of the

Act, 7 U.S.C. § 2 (2002).

112.    Defendant Eustace, directly or indirectly, controlled PAAM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations of PAAM alleged in this count, and thereby Eustace is liable for PAAM's violations of Section 4c(b) of the Act and Regulation 33.10 (a) – (c), pursuant to Section 13(b) of the Act.

113.    Each act of issuing of false account statements; each failure to disclose material facts; each act of showing false trading results to prospective participants; each posting of false trading results on the Defendants' website by the Defendants; and each act of misappropriation, including, but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4c(b) of the Act and Regulation 33.10 (a) – (c).

## COUNT THREE

### VIOLATIONS OF SECTION 4o(1) OF THE ACT AND REGULATION 4.41(a): FRAUD BY A COMMODITY POOL OPERATOR AND AN ASSOCIATED PERSON OF A COMMODITY POOL OPERATOR

114.    The allegations set forth in paragraphs 1 through 113 are realleged and incorporated herein by reference.

115.    Beginning in or about Spring 2001 and continuing through the present, Defendant Eustace, although not registered as such, acted as a CPO for the Option Capital Fund by soliciting, accepting or receiving funds from others and engaging in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of trading in commodities for future delivery or options on futures contracts on or subject to the rules of a contract market.

116.    Beginning in or about March 2003 and continuing through the present, Defendant PAAM was a registered CPO and acted as a CPO by soliciting, accepting or receiving funds from others and engaging in a business that is of the nature of an investment trust, syndicate, or

similar form of enterprise, for the purpose of trading in commodities for future delivery or options on futures contracts on or subject to the rules of a contract market.  Defendant Eustace was a registered AP of a CPO, PAAM, and acted as an AP of a CPO by soliciting prospective pool participants.

117.    Beginning in or about Spring 2001 and continuing through the present, Defendant Eustace, while acting as a CPO for the Option Capital Fund knowingly or with reckless disregard for the truth, employed a device, scheme or artifice to defraud Option Capital Fund pool participants, in violation of Section 4o(1)(A) of the Act, 7 U.S.C. § 6o(1)(A).

118.    Beginning in or about March 2003 and continuing through the present, Defendant PAAM, while acting as a CPO, and Defendant Eustace, while acting as an AP of PAAM, knowingly or with reckless disregard for the truth, employed a device, scheme or artifice to defraud LP pool participants and prospective LP Pool, Off-Shore Pool and Feeder Fund pool participants, in violation of Section 4o(1)(A) of the Act, 7 U.S.C. § 6o(1)(A), and Commission Regulation 4.41(a)(1), 17 C.F.R. § 4.41(a)(1).

119.    Beginning in or about Spring 2001 and continuing through the present, Defendant Eustace, while acting as a CPO for the Option Capital Fund, engaged in a transaction, practice or course of business which has operated as a fraud or deceit upon Option Capital Fund pool participants and prospective Option Capital Fund pool participants, in violation of Section 4o(1)(B) of the Act, 7 U.S.C. § 6o(1)(B).

120.    Beginning in or about March 2003 and continuing through the present, Defendant PAAM, while acting as a CPO, and Defendant Eustace, while acting as an AP of PAAM, engaged in a transaction, practice or course of business which has operated as a fraud or deceit upon LP Pool, Off-Shore Pool and Feeder Fund pool participants and prospective LP Pool, Off-

Shore Pool and Feeder Fund pool participants, in violation of Section 4o(1)(B) of the Act, 7 U.S.C. § 6o(1)(B), and Commission Regulation 4.41(a)(2), 17 C.F.R. § 4.41(a)(2).

121. Defendant Eustace, with respect to the Option Capital Fund, knowingly or with reckless disregard for the truth, violated Sections 4o(1)(A) and (B) of the Act, by, among other things: (a) issuing false account statements to Option Capital Fund participants showing false trading results; (b) omitting to inform Option Capital Fund participants of the material information that defendants had not engaged in any futures trading in the name of the Option Capital Fund after March 2003; and (c) misappropriating Option Capital Fund and LP Pool funds by transferring Option Capital Fund and LP Pool funds into Eustace's personal trading or banking accounts; and by collecting incentive and management fees that he had not earned and was therefore not entitled to collect.

122. The Defendants, with respect to the LP Pool, Feeder Fund and Off-Shore Pool, knowingly or with reckless disregard for the truth, violated Sections 4o(1)(A) and (B) of the Act by, among other things: (a) issuing false account statements to LP pool participants showing fictitious commodity futures and options trading; (b) omitting to inform LP Pool participants that the Defendants had not engaged in any commodity futures or options trading in the name of the pool or the pool participants; (c) providing false trading results to at least one prospective LP Pool participant showing profitable trading; (d) causing false statements to be issued to Off-Shore pool participants; (e) providing false account statements to Feeder Fund pool participants; (f) posting false trading results for the Off-Shore Pool on their website; and (g) misappropriating LP Pool, Feeder Fund and Off-Shore Pool funds by collecting incentive and management fees they had not earned and were therefore not entitled to collect.

123.    The Defendants, knowingly or with reckless disregard for the truth, violated Commission Regulations 4.41(a)(1) and (2), 17 C.F.R. § 4.41(a)(1) and (2) by, among other things: (a) posting false trading results for the Off-Shore Pool on its website, and (b) providing false trading results to at least one prospective LP Pool participant.

124.    In addition to his direct liability, the actions and failures of Eustace as alleged herein were done within the scope of his employment with PAAM, and therefore PAAM is liable for his violations of Sections 4o(1)(A) and (B) of the Act, and Commission Regulation 4.41(a)(1) and (2) pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2002).

125.    Defendant Eustace, directly or indirectly, controlled PAAM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting PAAM's violations alleged in this count, and thereby Defendant Eustace is liable for PAAM's violations of Sections 4o(1)(A) and (B) of the Act, and Commission Regulation 4.41(a)(1) and (2), pursuant to Section 13(b) of the Act.

126.    Each act of issuing of false account statements; each failure to disclose material facts; each act of showing false trading results to prospective participants; each act of misappropriation; and each posting of false trading results on the Defendants' website by the Defendants including, but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4o(1)(A) and (B) of the Act.

127.    Each act of showing false trading results to prospective participants; and each posting of false trading results on the Defendants' website by the Defendants including, but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4o(1)(A) and (B) of the Act. and Commission Regulation 4.41(a)(1) and (2).

## COUNT FOUR

### VIOLATIONS OF SECTION 4m(1) OF THE ACT: FAILURE TO REGISTER AS A COMMODITY POOL OPERATOR

128.    The allegations set forth in paragraphs 1 through 127 are re-alleged and incorporated herein by reference.

129.    Defendant Eustace, with respect to the Option Capital Fund, has used the mails or instrumentalities of interstate commerce in or in connection with his business as a CPO while failing to register with the Commission as a CPO, in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1).

## COUNT FIVE

### VIOLATIONS OF REGULATION 4.20: CPO'S ACCEPTING POOL FUNDS OTHER THAN IN THE NAME OF THE POOL, COMMINGLING OF POOL FUNDS WITH HIS OWN FUNDS, AND FAILURE TO TREAT THE POOL AS A SEPARATE ENTITY

130.    The allegations set forth in paragraphs 1 through 129 are re-alleged and incorporated herein by reference.

131.    As alleged above, by depositing Option Capital Fund pool funds into his personal accounts and not into accounts in the name of the Option Capital Fund pool, Eustace failed to operate the Option Capital Fund as a legal entity separate from himself as the pool operator, in violation of Commission Regulation 4.20(a), 17 C.F.R. § 4.20(a).

132.    As alleged above, Eustace, while operating as a CPO, accepted pool funds in his own name, in violation of Commission Regulation 4.20(b), 17 C.F.R. § 4.20(b).

133.    As alleged above, Eustace commingled the pool funds with his own property, in violation of Commission Regulation 4.20(c), 17 C.F.R. § 4.20(c).

First Amended Complaint                26

## VI.

## RELIEF REQUESTED

WHEREFORE, the Commission, respectfully requests that this Court, as authorized by

Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

a)    a permanent injunction prohibiting the Defendants and any other person or entity associated with them, including any successor thereof, from engaging in conduct violative of Sections 4b(a)(2)(i) - (iii), 4c(b), 4m(1), and 4o(1) (A) and (B) of the Act and Sections 4.20, 4.41 and 33.10 of the Commission's Regulations, and from engaging in any commodity-related activity, including soliciting new pool participants or pool funds;

b)    an order directing the Defendants to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constitute violations of the Act or Regulations, as described herein, and interest thereon from the date of such violations;

c)    an order directing the Defendants to make full restitution to every pool participant whose funds were received by him as a result of acts and practices which constituted violations of the Act and Regulations, as described herein, and interest thereon from the date of such violations;

d)    an order requiring Defendants to pay civil monetary penalties under the Act, to be assessed by the Court, in amounts of not more than the higher of $120,000 for each violation before October 24, 2004 and $130,000 for violations on or after October 24, 2004, or triple the monetary gain to Defendants for each violation of the Act and Regulations described herein; and

//
//
//
//
//
//
//
//
//
//
//

First Amended Complaint                              27

e)   such other and further remedial ancillary relief as the Court may
     deem appropriate.

Date: _August 2_____, 2005

Respectfully submitted by,

**ATTORNEYS FOR PLAINTIFF**

*Gretchen L. Lowe /sdl*

William Longwitz, Esq., MS Bar No. 101047
Karen Kenmotsu, Esq., NJ Bar No. 05713-1993
Gretchen L. Lowe, Esq.,  DC Bar No. 421995
Division of Enforcement
Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581
Phone – (202) 418-5642
Facsimile – (202) 418-5523

**JP**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

Case No. _05CV 2973_

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** | ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| **PAUL M. EUSTACE, AND PHILADELPHIA ALTERNATIVE ASSET MANAGEMENT COMPANY, LLC** | ) ) ) ) |
| Defendants. | ) ) ) ) ) |

**F I L E D**

**JUN 2 3 2005**

MICHA........ ...2, Clerk
By _____ Dep. Clerk

**Statutory Restraining Order Freezing Assets, Appointing a Temporary Receiver, Requiring Preservation of Documents, Requiring an Accounting and Repatriation of Assets, Authorizing Expedited Discovery, and Ordering Defendants to Show Cause Why a Preliminary Injunction Should Not Be Granted**

Plaintiff, the Commodity Futures Trading Commission ("Commission"), has filed a complaint for permanent injunction and other relief, and moved *ex parte*, pursuant to Section 6c of the Commodity Exchange Act, as amended ("Act"), 7 U.S.C. § 13a-1 (2002), for a statutory restraining order freezing assets, appointing a temporary receiver, permitting expedited discovery and ordering defendants to show cause why a permanent receiver should not be appointed and why a preliminary injunction should not be issued. The Court has considered the pleadings, declarations, exhibits, and memorandum filed in support of the Commission's motion and now being fully advised in the premises finds that:

(1)    This Court has jurisdiction over the subject matter of this case, and Section 6c of the Act, 7 U.S.C. §13a-1 (1994), authorizes *ex parte* relief.

**ENTERED**
**JUN 2 4 2005**
**CLERK OF COURT**

(8)     Expedited discovery is necessary to ascertain the existence and location of

assets and identify all investors; the timing restrictions of Fed. R. Civ. P. 26(d)

and (f), 30(a)(2)(C) and 34 do not apply to this proceeding in light of the

Commission's requested relief and its demonstration of good cause.

(9)     Good cause exists for the appointment of a temporary receiver in order to

prevent waste and dissipation of assets to the detriment of investors and to

assess and ensure the proper operation of the commodity pools currently

operated by the Defendants.

(10)    This is a proper case for granting a statutory restraining order *ex parte* to

preserve the status quo, protect public customers from loss and damage, and

enable the Commission to fulfill its statutory duties.

## DEFINITIONS

For the purposes of this Order, the following definitions apply:

1.      "Assets" means any legal or equitable interest in, right to, or claim to, any

real or personal property, including but not limited to chattels, goods, instruments,

equipment, fixtures, general intangibles, effects, leaseholds, mail or other deliveries,

inventory, checks, notes, accounts, credits, receivables, contracts, insurance policies, and

all cash, wherever located, whether in the United States or abroad.

2.      The term "document" is synonymous in meaning and equal in scope to the

usage of the term in Federal Rule of Civil Procedure 34(a), and includes, but is not

limited to, writings, drawings, graphs, charts, photographs, audio and video recordings,

computer records, and other data compilations from which information can be obtained

and translated, if necessary, through detection devices into reasonably usable form. A

draft or non-identical copy is a separate document within the meaning of the term.

3.    "Defendants" means Paul M. Eustace and Philadelphia Alternative Asset Management Company LLC, and any person insofar as he or she is acting in the capacity of an officer, agent, servant, employee, or attorney of Defendants, and any other person who receives actual notice of this Order by personal service or otherwise insofar as he or she is acting in concert or participation with the Defendants.

## RELIEF GRANTED

### *Asset Freeze*

### I.

**IT IS HEREBY ORDERED** that the Defendants, except as otherwise ordered by this Court, are restrained and enjoined from directly or indirectly:

A.    transferring, selling, alienating, liquidating, encumbering, pledging, leasing, loaning, assigning, concealing, dissipating, converting, withdrawing, or otherwise disposing of any assets, wherever located, including assets held outside the United States, except as provided in Paragraphs III and VI of this Order, or as otherwise ordered by the Court;

B.    Opening or causing to be opened any safe deposit boxes titled in the name or subject to access by any of the defendants.

C.    Notwithstanding the provisions of this paragraph, defendants shall transfer possession of all assets of the receivership defendants pursuant to paragraph VI of this Order.

### II.

### *Directives to Financial Institutions and Others*

**IT IS FURTHER ORDERED**, pending further Order of this Court, that any financial or brokerage institution, business entity, or person that holds, controls, or maintains custody of any account or asset titled in the name of, held for the benefit of, or otherwise under the control of any defendant, or has held, controlled, or maintained custody of any such account or asset of any defendant at any time shall:

A.   Prohibit Defendants, and all other persons from withdrawing, removing, assigning, transferring, pledging, encumbering, disbursing, dissipating, converting, selling or otherwise disposing of any such asset except as directed by further order of the Court or, as to receivership assets, as directed by the Receiver appointed herein;

B.   Deny Defendants, and all other persons access to any safe deposit box that is:

1.   titled in the name of any defendant, either individually or jointly; or

2.   otherwise subject to access by any defendant.

Notwithstanding this Paragraph, the Receiver appointed herein shall be provided with access to any safe deposit box titled in the name of, or subject to access by, the Defendants;

C.   Provide the Receiver and counsel for the Commission, within five (5) business days of receiving a copy of this Order, a statement setting forth:

1.   the identification number of each such account or asset titled in the name, individually or jointly, of any of the Defendants, or held on behalf of, or for the benefit of, any of the Defendants, or under the control of any of the Defendants;

2.   the balance of each such account, or a description of the nature and value of such asset as of the close of business on the day on which this Order is served, and, if the account or other asset has been closed or removed, the date closed or removed, the total funds removed in order to close the account, and the name of the person or entity to whom such account or other asset was remitted; and

3.      the identification of any safe deposit box that is either titled in the name, individually or jointly, of any Defendant, or is otherwise subject to access by any defendant;

D.      Upon request by the Receiver or the Commission, promptly provide the Receiver and the Commission with copies of all records or other documentation pertaining to such account or asset, including, but not limited to, originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs; and

E.      Cooperate with all reasonable requests of the Receiver relating to implementation of this Order, including transferring funds at the Receiver's direction and producing records related to defendants' accounts.

## III.

**IT IS FURTHER ORDERED** that within five (5) business days following the service of this Order or three (3) days prior to any hearing on the Commission's motion for preliminary injunction, whichever is sooner, each defendant shall:

A.      Provide the Commission and the Receiver with a full accounting of all funds, documents, and assets outside of the United States which are (1) titled in the name individually or jointly of such defendant; or (2) held by any person or entity, for the benefit of any defendant; or (3) under such defendant's direct or indirect control, whether jointly or singly;

B.      Transfer to the territory of the United States and deliver to the Receiver all funds, documents, and assets located in foreign countries which are (1) titled in the name individually or jointly of such defendant; or (2) held by

any person or entity, for the benefit of any defendant; or (3) under such

defendant's direct or indirect control, whether jointly or singly;

C.     Provide the Commission access to all records of accounts or assets of the

defendants held by financial institutions located outside the territorial

United States by signing the Consent to Release of Financial Records

attached to this Order.

### *Temporary Receiver*

### IV.

**IT IS FURTHER ORDERED** that ___C. Clark Hodgson, Jr.___ is

appointed temporary Receiver for the Defendant PAAM and any partners, affiliates or

subsidiaries or related entities of the Defendants (hereinafter referred to as the

"receivership defendants"), with the full powers of an equity receiver. The Receiver shall

be the agent of this Court in acting as Receiver under this Order.

### V.

**IT IS FURTHER ORDERED** that the Receiver is directed and authorized to

accomplish the following:

A.     Assume full control of the receivership defendants by removing defendant

Eustace, and any officer, independent contractor, employee, or agent of

the receivership defendants, from control and management of the affairs of

the receivership defendants; to the extent necessary, the Receiver may

authorize the Defendant Eustace, subject to monitoring by the Receiver, to

trade any accounts held in the name of or for the benefit of any commodity

pools, pool participants or other clients managed by Defendants for the

limited purpose of unwinding any open positions held in the accounts,

including liquidating or covering the exposure of any open positions in

accordance with trading strategies and applicable trading authorizations,

until the Receiver hires a person to manage and direct the trading of all accounts controlled by Defendants.

B.    Take exclusive custody, control, and possession of all the funds, property, mail and other assets of, in the possession of, or under the control of the receivership defendants, wherever situated. The Receiver shall have full power to sue for, collect, receive and take possession of all goods, chattels, rights, credits, moneys, effects, land, leases, books, records, work papers, and records of accounts, including computer-maintained information, and other papers and documents of the receivership defendants, including documents related to customers or clients whose interest are now held by or under the direction, possession, custody or control of the receivership defendants;

C.    Take all steps necessary to secure the business premises of the receivership defendants, including but not limited to premises located at 2701 Renaissance Boulevard, Fourth Floor, King of Prussia, Pennsylvania 19406; and any and all other premises under the control of the defendants;

D.    Preserve, hold and manage all receivership assets, and perform all acts necessary to preserve the value of those assets, in order to prevent any loss, damage or injury to investors, pool participants or clients;

E.    Prevent the withdrawal or misapplication of funds entrusted to the receivership defendants, and otherwise protect the interests of investors, pool participants or clients;

F.    Manage and administer the receivership defendants by performing all acts incidental thereto that the receiver deems appropriate, including hiring or dismissing any and all personnel or suspending operations;

G.    Collect all money owed to the receivership defendants;

H.      Initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to any actions or proceedings in state, federal or foreign court necessary to preserve or increase the assets of the receivership defendants or to carry out his or her duties pursuant to this Order;

I.      Choose, engage and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

J.      Issue subpoenas to obtain documents and records pertaining to the receivership, and conduct discovery in this action on behalf of the receivership estate;

K.      Open one or more bank accounts as designated depositories for funds of the receivership defendant.  The Receiver shall deposit all funds of the receivership defendants in such designated accounts and shall make all payments and disbursements from the receivership estate from such accounts; and

L.      Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order.  The Receiver shall apply to the Court for prior approval of any payment of any debt or obligation incurred by the receivership defendants prior to the date of entry of this Order, except for payments that the Receiver deems necessary or advisable to secure assets of the receivership defendants.

## VI.

**IT IS FURTHER ORDERED** that, immediately upon service of this Order upon them, Defendants and any other person or entity served with a copy of this Order, shall

immediately or within such time as permitted by the Receiver in writing, deliver over to the Receiver:

  A.  Possession and custody of all funds, assets, property, and all other assets, owned beneficially or otherwise, wherever situated, of the receivership defendants;

  B.  Possession and custody of documents of the receivership defendants, including but not limited to, all books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, and check registers), client lists, title documents and other papers;

  C.  Possession and custody of all precious metals, other commodities, funds, and other assets being held by or on behalf of the receivership defendants or on behalf of the receivership defendants' customers;

  D.  All keys, computer passwords, entry codes, and combinations to locks necessary to gain or to secure access to any of the assets or documents of the receivership defendants, including but not limited to, access to the receivership defendants' business premises, means of communication, accounts, computer systems, or other property; and

  E.  Information identifying the accounts, employees, properties or other assets or obligations of the receivership defendants.

## VII.

**IT IS FURTHER ORDERED** that Defendants, and all other persons or entities served with a copy of this order shall cooperate fully with and assist the Receiver. This cooperation and assistance shall include, but not be limited to, providing any information to the Receiver that the Receiver deems necessary to exercising the authority; providing any password required to access any computer or electronic files in any medium; and

discharging the responsibilities of the Receiver under this Order, and advising all persons who owe money to the receivership defendants that all debts should be paid directly to the Receiver.

**VIII.**

**IT IS FURTHER ORDERED** that except by leave of the Court, during the pendency of the receivership ordered herein, the Defendants, and all other persons and entities be and hereby are stayed from taking any action to establish or enforce any claim, right or interest for, against, on behalf of, in, or in the name of, the receivership defendants, the Receiver, receivership assets, or the Receiver's duly authorized agents acting in their capacities as such, including but not limited to, the following actions:

A.   Commencing, prosecuting, litigating or enforcing any suit, except that actions may be filed to toll any applicable statute of limitations;

B.   Accelerating the due date of any obligation or claimed obligation, enforcing any lien upon, or taking or attempting to take possession of, or retaining possession of, property of the receivership defendants or any property claimed by the receivership defendants, or attempting to foreclose, forfeit, alter or terminate any of the receivership defendants' interests in property, whether such acts are part of a judicial proceeding or otherwise;

C.   Using self-help or executing or issuing, or causing the execution or issuance of any court attachment, subpoena, replevin, execution or other process for the purpose of impounding or taking possession of or interfering with, or creating or enforcing a lien upon any property, wherever located, owned by or in the possession of the receivership defendants, or the Receiver, or any agent of the Receiver; and

D.    Doing any act or thing to interfere with the Receiver taking control, possession or management of the property subject to the receivership, or to in any way interfere with the Receiver or the duties of the Receiver; or to interfere with the exclusive jurisdiction of this Court over the property and assets of the receivership defendants.

This Paragraph does not stay the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

## IX.

**IT IS FURTHER ORDERED** that the Receiver and all personnel hired by the Receiver as herein authorized, including counsel to the Receiver, are entitled to reasonable compensation for the performance of duties pursuant to this Order and for the cost of actual out-of-pocket expenses incurred by them, from the assets now held by, or in the possession or control of, or which may be received by the receivership defendants. The Receiver shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation, with the first such request filed no more than sixty (60) days after the date of this Order. The Receiver shall not increase the hourly rates used as the bases for such fee applications without prior approval of the Court.

## X.

**IT IS FURTHER ORDERED** that, pursuant to 28 U.S.C. § 754 (1994), the Receiver shall file with the Clerk of the Court a bond in the amount of $ 20,000.00 with sureties to be approved by the Court, conditioned that the Receiver will well and truly perform the duties of the office and abide by and perform all acts the Court directs.

## XI.

### *Maintenance of and Access to Business Records*

**IT IS HEREBY ORDERED** that the defendants and all persons or entities who receive notice of this Order by personal service or otherwise, are restrained and enjoined from directly or indirectly destroying, mutilating, erasing, altering, concealing or disposing of, in any manner, directly or indirectly, any documents that relate to the business practices or business or personal finances of any defendant.

## XII.

**IT IS FURTHER ORDERED** that representatives of the Commission be immediately allowed to inspect the books, records, and other documents of the defendants and their agents including, but not limited to, paper documents, electronically stored data, tape recordings, and computer discs, wherever they may be situated and whether they are in the possession of the defendants or others, and to copy said documents, data and records, either on or off the premises where they may be situated.

## XIII.

### *Service of Order and Assistance of United States Marshals Service*

**IT IS FURTHER ORDERED** that copies of this Order may be served by any means, including facsimile transmission, upon any financial institution or other entity or person that may have possession, custody, or control of any documents or assets of any defendant, or that may be subject to any provision of this Order.

## XIV.

**IT IS FURTHER ORDERED** that the United States Marshals Service is directed to: (a) assist the Commission in the service of the summons, complaint, and this statutory restraining order on the Defendants; and (b) assist the Receiver in taking control and custody of the assets, records and business premises of the receivership defendants.

## XV.

### *Expedited Discovery*

**IT IS FURTHER ORDERED** that the parties and the Receiver are granted leave, at any time after service of this Order, to take the deposition of and demand the production of documents from any person or entity for the purpose of discovering the nature, location, status, and extent of assets of the Defendants, and the location of documents reflecting the business transactions of the Defendants; forty-eight (48) hours notice shall be deemed sufficient for any such deposition and five (5) days notice shall be deemed sufficient for the production of any such documents.

## XVI.

**IT IS FURTHER ORDERED** that the limitations and conditions set forth in Federal Rule of Civil Procedure 30(a)(2)(B) regarding subsequent depositions of an individual shall not apply to depositions taken pursuant to this Order.  No depositions taken pursuant to paragraph XV shall count towards the ten deposition limit set forth in Federal Rule of Civil Procedure 30(a)(2)(A).

## XVII.

**IT IS FURTHER ORDERED** that pursuant to Federal Rule of Civil Procedure 30(a)(2), the parties and the Receiver are granted leave to take the depositions of defendants confined in prison.

## XVIII.

### *Service on the Commission*

**IT IS FURTHER ORDERED** that the defendants shall serve all pleadings, correspondence, notices required by this Order, and other materials on the Commission by delivering a copy to William Longwitz, Trial Attorney, Division of Enforcement, Commodity Futures Trading Commission, 1155 21st Street, N.W., Washington, D.C. 20581.

## XIX.

### *Bond Not Required Of Plaintiff*

**IT IS FURTHER ORDERED** that:

24.     Plaintiff Commission is an agency of the United States of America and, accordingly, no bond need be posted by the Commission.

## XX.

### *Order to Show Cause*

**IT IS FURTHER ORDERED** that each of the Defendants shall appear before this Court on the ___16th___ day of ___August___, 2005, at ___10:30 a.m.___ ___.m., before the Honorable ___John R. Padova___, Courtroom ___17B___ at the United States Courthouse for the Eastern District of Pennsylvania at ___601 Market Street___, ___Philadelphia___, Pennsylvania, to show cause why this Court should not enter a preliminary injunction enjoining the defendants from further violations of the Act, continuing the freeze on the assets of the defendants, making the receiver's appointment permanent, and ordering any additional relief this Court deems appropriate.  Should any party wish to file a memorandum of law or other papers concerning the issuance of a preliminary injunction against the Defendants, such materials shall be filed, served and received by all parties at least two (2) days before the hearing ordered above.

**XXI.**

**IT IS FURTHER ORDERED** that this Order shall remain in full force and effect until further order of this Court, and that this Court retains jurisdiction of this matter for all purposes.

**SO ORDERED**, at _____Philadelphia_____, Pennsylvania on this __23rd__ day of ____June____, 2005, at _____.m.

_____
UNITED STATES DISTRICT JUDGE
JOHN R. PADOVA                    J.

16

## CONSENT TO RELEASE OF FINANCIAL RECORDS

I, _____, do hereby direct any bank or trust company at which I

have a bank account of any kind upon which I am authorized to draw, and its officers,

employees and agents, to disclose all information and deliver copies of all documents of

every nature in your possession or control which relate to said bank accounts to any

attorney of the Commodity Futures Trading Commission, and to give evidence relevant

thereto, in the matter of Commodity Futures Trading Commission v. Paul M. Eustace and

Philadelphia Alternative Asset Mangement Co. LLC., now pending before the United

States District Court for the Eastern District of Pennsylvania, and this shall be irrevocable

authority for so doing.  This direction is intended to apply to the laws of countries other

than the United States which restrict or prohibit the disclosure or bank information

without the consent of the holder of the account, and shall be construed as consent with

respect thereto, and the same shall apply to any of the bank accounts for which I may be a

relevant principal.


Dated: _____, 2005          _____

                                                               Signature

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>PAUL M. EUSTACE, AND PHILADELPHIA ALTERNATIVE ASSET MANAGEMENT COMPANY, LLC<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 05-CV-2973 (MMB) |

## CONSENT ORDER OF PRELIMINARY INJUNCTION AND OTHER EQUITABLE RELIEF

### I.

Defendants Paul M. Eustace ("Eustace") and Philadelphia Alternative Asset

Management, Co., LLC, ("PAAMCO"), without admitting or denying the allegations of the

Complaint for the purpose of this Consent Order of Preliminary Injunction and Other Equitable

Relief ("Order"), but admitting to allegations referring to jurisdiction and venue as stated under

Part II below, consent to the entry of this Order and state that this Order is entered into

voluntarily and that no promise or threat has been made by the Plaintiff, Commodity Futures

Trading Commission ("Commission"), or any member, officer, agent or representative thereof,

to induce Eustace or PAAMCO to consent to this Order.

### Background

On June 22, 2005, Plaintiff Commission filed an injunctive action against the Defendants

seeking injunctive and other equitable relief, as well as the imposition of restitution and civil

monetary penalties, for violations of the Commodity Exchange Act, as amended ("Act"), 7. U.S.C.

§§ 1 *et seq.* (2002), and the Commission Regulations promulgated thereunder ("Regulations"), 17

C.F.R. §§ 1 *et seq.* (2004).

On June 23, 2005, the Hon. John R. Padova issued an *ex parte* statutory restraining order

freezing assets under the control of the Defendants, prohibiting the destruction of documents and

appointing a temporary Receiver and scheduling a show cause hearing for August 16, 2005 to

determine why a preliminary injunction should not be issued in this case.

On July 8, 2005 the Hon. Paul S. Diamond amended the statutory restraining order to

allow the liquidation of Defendant Eustace's personal trading account at Velocity Futures, LP.

On August 2, 2005, the Commission filed a First Amended Complaint against Defendants

Eustace and PAAM, and a Motion for a Preliminary Injunction and for a Second Amended

Statutory Restraining Order.

On August 12, 2005, the Hon. Michael M. Baylson entered an order rescheduling the

August 16, 2005 show cause hearing originally scheduled by Judge Padova to September 15,

2005.

## II.

### JURISDICTION AND VENUE

**THE PARTIES AGREE AND THE COURT FINDS THAT FOR THE LIMITED**

**PURPOSES OF THIS CONSENT ORDER OF PRELIMINARY INJUNCTION:**

A.     This Court has jurisdiction over the Defendants and the subject matter of this action

pursuant to Section 6c of the Act, 7 U.S.C. §13a-1 (2002), which authorizes the

Commission to seek injunctive relief against any person whenever it shall appear that

such person has engaged, is engaging or is about to engage in any act or practice

constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

B.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. §1.13a-1(e) (2002), in that certain of the acts and practices referred to in the First Amended Complaint herein, dated August 2, 2005, occurred at 2701 Renaissance Boulevard, 4th Floor, King Of Prussia, Pennsylvania, within this district.

### III.

### DEFINITIONS

For the purposes of this Order, the following definitions apply:

A.     "Assets" means any legal or equitable interest in, right to, or claim to, any real or personal property, including but not limited to chattels, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds, mail or other deliveries, inventory, checks, notes, accounts, credits, receivables, contracts, insurance policies, and all cash, wherever located, whether in the United States or abroad.

B.     The term "document" is synonymous in meaning and equal in scope to the usage of the term in Federal Rule of Civil Procedure 34(a), and includes, but is not limited to, writings, drawings, graphs, charts, photographs, audio and video recordings, computer records, and other data compilations from which information can be obtained and translated, if necessary, through detection devices into reasonably usable form. A draft or non-identical copy is a separate document within the meaning of the term.

C.     "Defendants" means Paul M. Eustace and Philadelphia Alternative Asset Management Company LLC, and any person insofar as he or she is acting in the capacity of an officer, agent, servant, employee, or attorney of Defendants, and any other person who receives

actual notice of this Order by personal service or otherwise insofar as he or she is acting

in concert or participation with the Defendants.

D.    "Option Capital Fund" means Option Capital Fund LP, and any person insofar as he or

she is acting in the capacity of an officer, agent, servant, employee, or attorney of Option

Capital Fund, and any other person who receives actual notice of this Order by personal

service or otherwise insofar as he or she is acting in concert or participation with the

Defendants and/or with Option Capital Fund.

E.    "Philadelphia Alternative Asset Fund, LP (the "LP Pool")" means the LP Pool and any

person insofar as he or she is acting in the capacity of an officer, agent, servant,

employee, or attorney of the LP Pool, and any other person who receives actual notice of

this Order by personal service or otherwise insofar as he or she is acting in concert or

participation with the Defendants and/or with the LP Pool.

F.    "Philadelphia Alternative Asset Fund, Ltd. (the Off-Shore Pool")" means the Off-Shore

Pool, and any person insofar as he or she is acting in the capacity of an officer, agent,

servant, employee, or attorney of the Off-Shore Pool, and any other person who receives

actual notice of this Order by personal service or otherwise insofar as he or she is acting

in concert or participation with the Defendants and/or with the Off-Shore Pool.

G.    "Philadelphia Alternative Asset Fund, LLC (the "Feeder Fund")" means the Feeder Fund,

and any person insofar as he or she is acting in the capacity of an officer, agent, servant,

employee, or attorney of Feeder Fund, and any other person who receives actual notice of

this Order by personal service or otherwise insofar as he or she is acting in concert or

participation with the Defendants and/or with the Feeder Fund.

**RELIEF GRANTED**

**IV.**

*Prohibited Conduct*

**IT IS HEREBY ORDERED THAT:**

The Defendants, all persons insofar as they are acting in the capacity of agents, servants, employees, successors, assigns, or attorneys of the Defendants, and all persons insofar as they are acting in active concert or participation with the Defendants who receive actual notice of this order by personal service or otherwise, shall be prohibited and restrained from directly or indirectly:

A.    In or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other persons, where such contract for future delivery was or could be used for:

(1) hedging any transaction in interstate commerce in such commodity or the products or byproducts thereof, or

(2) determining the price basis of any transaction in interstate commerce in such commodity, or

(3) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof,

(i)    cheating or defrauding or attempting to cheat or defraud other persons;

(ii)    willfully making or causing to be made to other persons false reports or statements, or willfully entering or causing to be entered for other persons false records in or in connection with any order to make, or the making of,

any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other person; and

(iii)   willfully deceiving or attempting to deceive other persons

in violation of Section 4b(a)(2)(i) - (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) - (iii) (2002).

B.   In or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transactions, cheating or defrauding or attempting to cheat or defraud other persons; making or causing to be made to other persons false reports or statements thereof, or causing to be entered for other persons false records thereof; and deceiving or attempting to deceive other persons; all in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) and Regulation 33.10, 17 C.F.R. § 33.10.

C.   While acting as a Commodity Pool Operator, or an Associated Person of a Commodity Pool Operator, employing a device, scheme or artifice to defraud pool participants or prospective pool participants, in violation of Section 4o(1)(A) of the Act, 7 U.S.C. § 6o(1)(A) and Regulation 4.41(a)(1), 17 C.F.R. § 4.41(a)(1).

D.   While acting as a Commodity Pool Operator, or an Associated Person of a Commodity Pool Operator, engaging in a transaction, practice or course of business which operates as a fraud or deceit upon pool participants or prospective pool participants, in violation of Section 4o(1)(B) of the Act, 7 U.S.C. § 6o(1)(B) and Regulation 4.41(a)(2), 17 C.F.R. § 4.41(a)(2).

**IT IS FURTHER ORDERED THAT:**

Defendant Eustace, all persons insofar as they are acting in the capacity of agents, servants, employees, successors, assigns, or attorneys of Defendant Eustace, and all persons

insofar as they are acting in active concert or participation with Defendant Eustace who receive

actual notice of this order by personal service or otherwise, shall be prohibited and restrained

from directly or indirectly:

E.    Using the mails or instrumentalities of interstate commerce in or in connection with the

business of a Commodity Pool Operator while failing to register as a Commodity Pool

Operator, in violation of Section 4m(1) of the Act.

F.    While acting as a Commodity Pool Operator:  (i) failing to operate any other pool as a

cognizable legal entity separate from the pool operator; (ii) receiving funds, securities or

other property from an existing or prospective pool participant for interest in a pool which

funds are not in the name of the pool; and (iii) commingling the property of any pool that

he operates or intends to operate with the property of any other person in violation of

Commission Regulation 4.20(a)-(c), 17 C.F.R. § 4.20(a)-(c).

**IT IS FURTHER ORDERED THAT:**

G.    The Defendants and any other person or persons acting in concert or participation with

Defendants are prohibited from soliciting new customers or otherwise soliciting, accepting

or receiving funds or other property from an existing or prospective participant in any

investment relating to commodity futures contracts or options on commodity futures

contracts.

## V.

### *Asset Freeze*

**IT IS FURTHER ORDERED THAT:**

Defendants, except as otherwise ordered by this Court, are restrained and enjoined from directly or indirectly:

A.    transferring, selling, alienating, liquidating, encumbering, pledging, leasing, loaning, assigning, concealing, dissipating, converting, withdrawing, or otherwise disposing of any assets, including but not limited to any assets relating to Option Capital Fund, the LP Pool, the Off-Shore Pool, the Feeder Fund, and all assets of or under the management or control of the Defendants, wherever located, including assets held outside the United States, except as provided in Parts VII and X of this Order, or as otherwise ordered by the Court;

B.    Accessing or opening, or causing to be accessed or opened, any safe deposit boxes titled in the name or subject to access by any of the Defendants.

C.    Notwithstanding the provisions of this Part V, Defendants shall transfer possession of all assets identified above in this Part V, paragraph A, pursuant to the transfer provisions of Part X, below, except for those assets held solely in the name of defendant Eustace; provided however that the assets held solely in the name of defendant Eustace remain subject to the provisions of paragraphs A and B above.

The assets affected by this Part V shall not include assets that have been obtained by the Defendants after the entry of this order and are not derived from or otherwise related to the activities alleged in the Commission's First Amended Complaint.

## VI.

### *Directives to Financial Institutions and Others*

**IT IS FURTHER ORDERED THAT:**

Pending further Order of this Court, that any financial or brokerage institution, business entity, or person that holds, controls, or maintains custody of any account or asset titled in the name of, held for the benefit of, or otherwise under the control of any of the Defendants, or has held, controlled, or maintained custody of any such account or asset of any of the Defendants at any time shall:

A.    Prohibit Defendants, and all other persons from withdrawing, removing, assigning, transferring, pledging, encumbering, disbursing, dissipating, converting, selling or otherwise disposing of any such asset except as directed by further order of the Court or, as to receivership assets, as directed by the Receiver appointed herein;

B.    Deny Defendants, and all other persons access to any safe deposit box that is:

    (1)    titled in the name of any of the Defendants, either individually or jointly; or

    (2)    otherwise subject to access by any of the Defendants.

C.    Notwithstanding the provisions of this Part VI, the Receiver appointed herein shall be provided with access to any safe deposit box titled in the name of, or subject to access by, the receivership Defendants, as defined in Section VIII below;

D.    Provide the Receiver and counsel for the Commission, within five (5) business days of receiving a copy of this Order, a statement setting forth:

    (1)    the identification number of each such account or asset titled in the name, individually or jointly, of any of the Defendants, or held on behalf of, or for the benefit of, any of the Defendants, or under the control of any of the Defendants;

(2)    the balance of each such account, or a description of the nature and value of such

asset as of the close of business on the day on which this Order is served, and, if the

account or other asset has been closed or removed, the date closed or removed, the total

funds removed in order to close the account, and the name of the person or entity to

whom such account or other asset was remitted; and

(3)    the identification of any safe deposit box that is either titled in the name,

individually or jointly, of any Defendants, or is otherwise subject to access by any

of the Defendants;

E.    Upon request by the Receiver or the Commission, promptly provide the Receiver and the

Commission with copies of all records or other documentation pertaining to such account

or asset, including, but not limited to, originals or copies of account applications, account

statements, signature cards, checks, drafts, deposit tickets, transfers to and from the

accounts, all other debit and credit instruments or slips, currency transaction reports,

1099 forms, and safe deposit box logs; and

F.    Cooperate with all reasonable requests of the Receiver relating to implementation of this

Order, including transferring funds at the Receiver's direction and producing records related to

Defendants' accounts.

**VII.**

**IT IS FURTHER ORDERED THAT:**

Within five (5) business days following the service of this Order, if they have not done so

already, Defendants shall:

A.    Provide the Commission and the Receiver with a full accounting of all funds, documents,

and assets located inside or outside of the United States which are (1) titled in the name

individually or jointly of such Defendants; or (2) held by any person or entity, for the benefit of any of the Defendants; or (3) under such Defendants' direct or indirect control, whether jointly or singly;

B.      Transfer to the territory of the United States and deliver to the Receiver all funds, documents, and assets located inside or outside of the United States relating to or derived from the operations of Option Capital Fund, the LP Pool, the Off-Shore Pool and the Feeder Fund which are (1) titled in the name individually or jointly of such Defendants; or (2) held by any person or entity, for the benefit of any of the Defendants; or (3) under such Defendants' direct or indirect control, whether jointly or singly (The Commission by motion may later seek repatriation of all funds, documents or assets of defendants).;

C.      Provide the Commission access to all records of accounts or assets of the Defendants held by financial institutions located inside or outside the territorial United States by signing the Consent to Release of Financial Records attached to this Order.

## VIII.

## PERMANENT RECEIVER

**IT IS FURTHER ORDERED THAT:**

C. Clark Hodgson, Jr. is appointed permanent Receiver for Defendant PAAM and any of its partners, affiliates or subsidiaries or related entities, including, but not limited to Option Capital Fund, the LP Pool, the Off-Shore Pool and the Feeder Fund (hereinafter referred to as the "receivership Defendants"), with the full powers of an equity receiver. The Receiver shall be the agent of this Court in acting as Receiver under this Order. For the purposes of seeking the aid and recognition of any court or judicial, regulatory or administrative body outside of the United

States of America, the Receiver shall act and be deemed to be the foreign representative of the receivership Defendants.

IX.

**IT IS FURTHER ORDERED THAT:**

The Receiver is directed and authorized to accomplish the following:

A.    Assume full control of the receivership Defendants by removing Defendant Eustace as director, officer, partner, employee, independent contractor, agent or any other capacity, and any other director, officer, partner, independent contractor, employee, or agent of the receivership Defendants, from control and management of the affairs of the receivership Defendants.

B.    Take exclusive custody, control, and possession of all the funds, property, mail and other assets of, in the possession of, or under the control of the receivership Defendants, wherever situated.  The Receiver shall have full power to sue for, collect, receive and take possession of all goods, chattels, rights, credits, moneys, effects, land, leases, books, records, work papers, and records of accounts, including computer-maintained information, and other papers and documents of the receivership Defendants, including documents related to customers or clients whose interest are now held by or under the direction, possession, custody or control of the receivership Defendants.

C.    Take all steps necessary to secure the business premises of the receivership Defendants and any and all other premises under the control of the receivership Defendants, wherever situated.

D.  Preserve, hold and manage all receivership assets, and perform all acts necessary to preserve the value of those assets, in order to prevent any loss, damage or injury to customers or clients.

E.  Prevent the withdrawal or misapplication of funds entrusted to the receivership Defendants, and otherwise protect the interests of customers or clients.

F.  Manage and administer the receivership Defendants by performing all acts incidental thereto that the receiver deems appropriate, including hiring or dismissing any and all personnel or suspending operations.

G.  Collect all money owed to the receivership Defendants.

H.  Initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to any actions or proceedings in state, federal or foreign court necessary to preserve or increase the assets of the receivership Defendants or to carry out his or her duties pursuant to this Order.

I.  Choose, engage and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order.

J.  Issue subpoenas to obtain documents and records pertaining to the receivership, and conduct discovery in this action on behalf of the receivership estate.

K.  Open one or more bank accounts as designated depositories for funds of the receivership defendant.  The Receiver shall deposit all funds of the receivership Defendants in such designated accounts and shall make all payments and disbursements from the receivership estate from such accounts.

L.   Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order.  The Receiver shall apply to the Court for prior approval of any payment of any debt or obligation incurred by the receivership Defendants prior to the date of entry of this Order, except for payments that the Receiver deems necessary or advisable to secure assets of the receivership Defendants.

M.   Liquidate all assets of the receivership Defendants and hold such assets pending further order of the Court.

N.   Vacate the business premises occupied by the receivership Defendants and consolidate all records and other assets by moving assets and records currently located outside of this District to a secure facility maintained within this District.

### X.

**IT IS FURTHER ORDERED THAT:**

Upon service of this Order upon them, Defendants, and any other person or entity served with a copy of this Order, shall immediately, or within such time as permitted by the Receiver in writing, deliver over to the Receiver:

A.   Possession and custody of all funds, assets, property, and all other assets, owned beneficially or otherwise, wherever situated, of the receivership Defendants.

B.   Possession and custody of documents of the receivership Defendants, including but not limited to, all books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, and check registers), client lists, title documents and other papers.

C.      Possession and custody of all precious metals, other commodities, funds and other assets being held by or on behalf of the receivership Defendants or on behalf of the receivership Defendants' customers.

D.      All keys, computer passwords, entry codes, and combinations to locks necessary to gain or to secure access to any of the assets or documents of the receivership Defendants, including but not limited to, access to the receivership Defendants' business premises, means of communication, accounts, computer systems, or other property.

E.      Information identifying the accounts, employees, properties or other assets or obligations of the receivership Defendants.

## XI.

**IT IS FURTHER ORDERED THAT:**

Defendants and all other persons or entities served with a copy of this order shall cooperate fully with and assist the Receiver. This cooperation and assistance shall include, but not be limited to, providing any information to the Receiver that the Receiver deems necessary to exercising the authority and discharging the responsibilities of the Receiver under this Order; providing any password required to access any computer or electronic files in any medium; and advising all persons who owe money to the receivership Defendants that all debts should be paid directly to the Receiver.

## XII.

**IT IS FURTHER ORDERED THAT:**

Except by leave of the Court, during the pendency of the receivership ordered herein, the Defendants and all other persons and entities be and hereby are stayed from taking any action to establish or enforce any claim, right or interest for, against, on behalf of, in, or in the name of,

the receivership Defendants, the Receiver, receivership assets, or the Receiver's duly authorized agents acting in their capacities as such, including but not limited to, the following actions:

A.     Commencing, prosecuting, litigating or enforcing any suit, except that actions may be filed to toll any applicable statute of limitations.

B.     Accelerating the due date of any obligation or claimed obligation, enforcing any lien upon, or taking or attempting to take possession of, or retaining possession of, property of the receivership Defendants or any property claimed by the receivership Defendants, or attempting to foreclose, forfeit, alter or terminate any of the receivership Defendants' interests in property, whether such acts are part of a judicial proceeding or otherwise.

C.     Using self-help or executing or issuing, or causing the execution or issuance of any court attachment, subpoena, replevin, execution or other process for the purpose of impounding or taking possession of or interfering with, or creating or enforcing a lien upon any property, wherever located, owned by or in the possession of the receivership Defendants, or the Receiver, or any agent of the Receiver.

D.     Doing any act or thing to interfere with the Receiver taking control, possession or management of the property subject to the receivership, or to in any way interfere with the Receiver or the duties of the Receiver; or to interfere with the exclusive jurisdiction of this Court over the property and assets of the receivership Defendants.

This Part XII does not stay the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

## XIII.

**IT IS FURTHER ORDERED THAT:**

The Receiver and all personnel hired by the Receiver as herein authorized, including counsel to the Receiver, are entitled to reasonable compensation for the performance of duties pursuant to this Order and for the cost of actual out-of-pocket expenses incurred by them, from the assets now held by, or in the possession or control of, or which may be received by the receivership Defendants. The Receiver shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation, with the first such request filed no more than sixty (60) days after the date of this Order. The Receiver shall not increase the hourly rates used as the bases for such fee applications without prior approval of the Court.

## XIV.

**IT IS FURTHER ORDERED THAT:**

Pursuant to 28 U.S.C. § 754 (2002), the Receiver shall maintain the bond in the amount of $20,000 obtained pursuant to the terms of the ex parte statutory restraining order previously entered in this case by the Hon. John R. Padova on June 23, 2005.

## XV.

## MAINTENANCE OF AND ACCESS TO RECORDS

**IT IS FURTHER ORDERED THAT:**

Defendants and all persons or entities who receive notice of this Order by personal service or otherwise, are restrained and enjoined from directly or indirectly destroying, mutilating, erasing, altering, concealing or disposing of, in any manner, directly or indirectly, any documents that relate to the business practices or business or personal finances of any Defendant.

## XVI.

**IT IS FURTHER ORDERED THAT:**

Representatives of the Commission be immediately allowed to inspect the books, records, and other documents of the Defendants and their agents including, but not limited to, paper documents, electronically stored data, tape recordings, and computer discs, wherever they may be situated and whether they are in the possession of the Defendants or others, and to copy said documents, data and records, either on or off the premises where they may be situated.

## XVII.

**IT IS FURTHER ORDERED THAT:**

This Order shall remain in full force and effect until further order of this Court, and that this Court retains jurisdiction of this matter for all purposes.

**IT IS SO ORDERED.**

Dated: ___9/19/05___

_____
Michael M. Baylson, U.S.D.J.

CONSENTED TO AND APPROVED BY:

U.S. COMMODITY FUTURES TRADING COMMISSION

By: _____
Gretchen L. Lowe
*Attorney for U.S. Commodity Futures Trading Commission*

mail
cc: Huber
Lowe
Giacometti
Rosengard
Longwitz

Paul M. Eustace

By: _____
Paul M. Eustace
*Pro Se*

Philadelphia Alternative Asset Management, Co., LLC

By: _____
Lee A. Rosengard

*Counsel for the Receiver, C. Clark Hodgson, Jr.*